STATE of Wisconsin, Plaintiff-Respondent,

v.

Kevin L. JONES, Defendant-Appellant.

Court of Appeals

No. 97–1806–CR.  Submitted on briefs January 8,
1998.—Decided February 4, 1998.

(Also reported in 576 N.W.2d 580.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Terry W. Rose* of *Rose & Rose* of Kenosha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *James M. Freimuth,* assistant attorney general.

Before Brown, Nettesheim and Anderson, JJ.

BROWN, J.   Kevin L. Jones entered into a nonprosecution agreement with the district attorney in exchange for information about a police investigation into a double homicide. The district attorney subsequently determined that Jones had breached the agreement by misidentifying the individual who ordered the murders and filed charges against him. Jones then moved to enforce the agreement and the trial court found that (1) the nonprosecution agreement was invalid because the district attorney lacks the power to enter into such agreements, and (2) even if the nonprosecution agreement was valid, Jones breached the agreement and the State was free to bring charges against him.

We reverse. Wisconsin case law has consistently recognized the discretionary power of a district attor-

ney to enter into nonprosecution agreements with individuals in exchange for information furthering the investigation of a crime. Also, we conclude that the trial court did not make a finding from the conflicting testimony as to whether the State knew Jones was mistaken about the identification prior to entering into the agreement. Without this finding of fact, we are unable to determine if Jones' misrepresentation constituted a material breach of the agreement. We therefore reverse the trial court's finding that Jones breached the agreement and remand for further proceedings.

On November 21, 1992, the police discovered the bodies of Charles Toy and Katrina Powell in the front seat of a car parked in an alleyway in the city of Racine. Both individuals had been shot in the head. Apparently, the police suspected that Jones and Anthony C. Hill were involved in the murders; however, it appears from the record that they were unable to gather enough evidence to charge either man.

At some later date in 1993—the record is unclear as to when—the district attorney for Racine county filed a criminal complaint against Jones charging him with several crimes, including two counts of attempted first-degree intentional homicide. None of these crimes, however, were connected to the 1992 double homicide. In June 1994, Jones, through his attorney, Domingo S. Cruz, approached the district attorney to propose a plea bargain in which Jones would tell them everything he knew about the earlier, and unrelated, 1992 double homicide. In exchange for this information, Jones would plead guilty to a reduction in the charges pending against him and would be given "substantial consideration in . . . any recommendation that is made by the State with respect to his sentence or sentences." As a further condition, Jones asked for a

nonprosecution agreement in which the district attorney agreed not to prosecute him for his involvement in the 1992 double homicide. In return, Jones agreed to testify for the State if required to do so.

The district attorney and Detective Jan Soderberg, who was investigating the 1992 double murder, accepted this proposal. Cruz then drafted the agreement which the district attorney, Soderberg, Jones and Cruz signed. Jones, in both an interview and a sworn affidavit, then told Soderberg all of the information he knew about the 1992 murders. He told Soderberg that he, Hill and another man drove to a Racine tavern where they were hired by a man known as J.B. Money to kill Toy. Jones picked out a picture of a man named Jimmy Carter from a police photo array as depicting the man he knew as Money. He further told Soderberg how they then found Toy and Powell sitting in a car parked in an alleyway and how he stood lookout while Hill shot both Toy and Powell. Apparently, Hill shot Powell to make sure there were no witnesses. They then drove back to the bar, where Jones received half an ounce of cocaine for his part in the contract killing.

In return for his cooperation with the police, the district attorney reduced the charges then pending against Jones and recommended a lesser period of incarceration.[1] However, in August 1994, Soderberg told the district attorney that he had just learned that Carter had been incarcerated in a Wisconsin state prison at the time of the double murders; therefore, he could not have been the man at the tavern who ordered the killings. The district attorney then determined that

---

[1] The trial court in that case, however, did not follow the State's recommendation and sentenced Jones to eighteen years in prison, the maximum period of incarceration allowed for the crimes charged.

because Jones had falsely identified Carter as the man who contracted for Toy's killing, he had materially breached the nonprosecution agreement and Jones was charged with two counts of first-degree intentional homicide for his role in the murders.

Jones subsequently filed a motion to dismiss the charges or suppress the statement he made to police. At a hearing on this motion, Jones contended that prior to executing the affidavit, both the district attorney and Soderberg knew he might have been wrong to identify Carter. In support of Jones' position, Cruz testified that before Jones executed the affidavit, Soderberg told him how he believed Jones was wrong in identifying Carter as the man who ordered the homicides because Carter was incarcerated at the time. Further, Cruz believed that Soderberg had raised this issue with Jones prior to executing the affidavit but that Jones persisted in his claim that Carter ordered the killings. Cruz also testified that when he further discussed this issue with Soderberg, he came away with the impression that Soderberg did not view the veracity of Jones' identification of Carter to be "critical" to complying with the agreement and that he "was satisfied that Mr. Jones was present and telling the truth about what he had relayed to him in terms of a detail about the homicides." Moreover, Cruz understood Soderberg to be concerned only about information regarding Hill's involvement in the killings. Cruz testified that based on the comments made by Soderberg and the understandings derived therefrom, he advised Jones to execute the agreement.

However, Soderberg provided contradictory testimony. He did not recall ever telling Cruz that the information about Carter was not important or material to complying with the agreement. He also did not

recall telling Cruz that he believed Jones was incorrect in identifying Carter or that he was only concerned with Hill's role in the homicides. In fact, he maintained that he did not know Carter was incarcerated until over a year after Jones submitted the affidavit.

In its ruling on the motion, the trial court first determined that the nonprosecution agreement was not a legal agreement because district attorneys do not have "the authority to enter into any kind of an agreement that grants anybody immunity." Moreover, the trial court found that even if the nonprosecution agreement were legal, Jones had been untruthful in identifying Carter. The trial court went on to state:

> The defendant claims that this issue [the identification of Carter] was known at the time of the negotiations. And that has certainly been established by testimony of Mr. Cruz. The fact that it was known at the time in no way excuses the defendant from his obligation of being truthful. And this is such a core issue that it cannot be dismissed as of no consequence. . . . [I]n fact, even if . . . that had been the view of the district attorney and Investigator Soderberg at the time that this deal was struck, it wouldn't make any difference because it is such a core issue.

In other words, the trial court determined that even if Cruz' testimony was historically accurate, there was still a material breach because the core agreement called for Jones not to lie; but he lied. The trial court ordered that the prosecution be allowed to proceed. Jones petitioned for review of this nonfinal order pursuant to RULE 809.50, STATS., and we granted the petition.

We first address the trial court's holding that district attorneys lack the power to enter into

nonprosecution agreements. The trial court found that the district attorney's nonprosecution agreement with Jones was void and without proper legal basis because the power to grant immunity from prosecution vests solely with the judicial branch. The trial court understood that immunity can only be conferred in accordance with § 972.08, STATS., and that statute gives only the trial court the power to grant immunity.

We disagree. We also note that the State, in its brief, also disagrees with the trial court. The statute and case law that the court was referring to most often involves situations when a witness called by the State refuses to testify based upon a Fifth Amendment privilege. In such situations, the State may request formal immunity from prosecution, but only the trial court, at its discretion, may grant it. *See* § 972.08, STATS. But by relying upon this statute and the case law pertinent to it, the trial court has failed to distinguish between cases where the witness has become subject to the control of the court and those situations where the court is not yet involved and the suspect is yet uncharged. *See State v. Kenyon,* 85 Wis. 2d 36, 45, 270 N.W.2d 160, 164 (1978). In other words, the question to ask is whether the proceeding is now under the control of the court because the person has been charged. If the person has been charged, and especially if the person is on the witness stand, certainly the person and the district attorney are under the control of the court.

██

But here, the agreement was struck before the court became involved. It was a *pre*charging decision, not a postcharging decision.[2] The district attorney

[2] We acknowledge that under the facts of this case Jones had already been charged with several other crimes at the time the district attorney agreed not to prosecute him for the double

entered into a precharging, nonstatutory agreement with an individual not to exercise the discretionary power to prosecute in exchange for information about a criminal investigation. We have no doubt that it is within the discretionary power of a district attorney to enter into these types of nonprosecution agreements *prior* to filing criminal charges in exchange for information about a criminal investigation. *See* Graham Hughes, *Agreements for Cooperation in Criminal Cases,* 45 VAND. L. REV. 1, 10 (1992) (Unlike a plea bargain in which "a court must hold a plea hearing and approve a plea bargain, the [nonprosecution agreement] is not subject to any judicial scrutiny.").

■

The duty of a district attorney is to administer justice, not obtain convictions. As such, district attorneys are under no obligation or duty to charge in all cases where there appears to be a violation of the law. *See State v. Karpinski,* 92 Wis. 2d 599, 607, 285 N.W.2d 729, 734 (1979). In order to carry out their duty, district attorneys have great discretion in determining whether to commence a prosecution, *see id.,* and Wis-

---

homicide in exchange for information; therefore, the decision to enter into the nonprosecution agreement could be cast as a postcharging decision—it would be a condition of the plea bargain with Jones—subject to judicial approval. But this argument was not raised by either party, and the record is insufficient for us to determine whether the nonprosecution agreement was before the trial court during the plea hearing. However, a determination that the nonprosecution agreement was part of the plea bargain would not change our conclusion that the agreement is valid; if the nonprosecution agreement was part of the plea bargain before the trial court at the plea hearing, it received judicial approval when the court accepted the plea.

consin case law has repeatedly noted that "[t]he discretion resting with the district attorney in determining whether to commence a [criminal] prosecution is almost limitless . . . ." *Kenyon*, 85 Wis. 2d at 45, 270 N.W.2d at 164. Clearly, if it is within the discretionary power of the district attorney not to bring a criminal charge, it is also within his or her power to enter into a precharge, nonprosecution agreement in exchange for information if it is determined that doing so will further the administration of justice. *See* Hughes, *supra*, at 12. As we stated at the outset, justice, not convictions, is the district attorney's goal and nonprosecution agreements in exchange for information can be a valuable means to achieve this end. Further, nonprosecution agreements are a powerful and pragmatic tool because they turn offenders into informers, thereby making criminals suspicious of each other and punishing those guilty persons who might otherwise elude justice. *See Zani v. State,* 701 S.W.2d 249, 252–53 (Tex. Crim. App. 1985).

Wisconsin case law, moreover, supports our conclusion. While in *State v. Lukensmeyer,* 140 Wis. 2d 92, 102, 409 N.W.2d 395, 399 (Ct. App. 1987), we simply assumed without deciding "that a prosecutor may lawfully enter an agreement not to prosecute in return for cooperation in a criminal investigation," other case law is more forceful. In *State v. Nerison,* 136 Wis. 2d 37, 401 N.W.2d 1 (1987), our supreme court addressed the issue of whether a district attorney's decision to enter into nonprosecution agreements with two individuals in exchange for information and their testimony unfairly prejudiced the defendant. The court held that the district attorney's decision to enter into the nonprosecution agreements was not so "corrupt" that it crossed the line of due process and did not deny a fair

trial to the defendant against whom the bargained for testimony was used. *See id.* at 45, 401 N.W.2d at 4. While it is true that the *Nerison* court did not make an explicit announcement that nonprosecution agreements are valid, it is implicit. A logically necessary facet of the court's opinion was that the district attorney had the power to initially grant concessions and enter into the nonprosecution agreements in exchange for information and testimony. Moreover, we think it is important to note that the case law is replete with instances in which a district attorney during the course of a criminal investigation entered into a nonprosecution agreement in exchange for information or testimony against a defendant. In none of these cases has it ever been questioned whether the practice of nonprosecution agreements is an invalid exercise of a district attorney's discretionary power. *See, e.g., Lukensmeyer,* 140 Wis. 2d at 96–97, 409 N.W.2d at 397 (district attorney entered into nonprosecution agreement in exchange for information about a murder investigation). We reverse the trial court's ruling on this issue.

■

We now turn to the trial court's finding that Jones breached the nonprosecution agreement. A court may vacate a nonprosecution agreement where a material and substantial breach of the agreement has been proven. *See State v. Whitman,* 160 Wis. 2d 260, 268, 466 N.W.2d 193, 196 (Ct. App. 1991). "The party seeking to vacate the agreement must prove the breach by clear and convincing evidence." *Id.*

According to the trial court, Jones breached the agreement because he misrepresented a "core issue" of the agreement by implicating Carter as the man who ordered the killings. The trial court did not think it

important to decide whether Soderberg knew beforehand that Jones might be wrong in identifying Carter as the man who ordered the killing. Instead, the court opined that even if Soderberg knew of the error before the deal was struck, this fact would in no way excuse Jones from his obligation under the agreement to tell the truth.

Again we disagree with the trial court. It was obviously the trial court's opinion that the agreement called for Jones to tell the complete truth about every fact conveyed to the State. But what if that was not the agreement? What if the agreement was to tell the complete truth only about Hill's involvement in the killings? If a trier of fact were to believe Cruz, then that was exactly the agreement. If the trier of fact were to believe Soderberg, then that would not be the agreement. In sum, the question is not whether Jones lied, but whether the lie was material to the agreement. This question cannot be answered without first deciding the sharp conflict in the testimony between Cruz and Soderberg. Whether the breach was material and substantial is the critical issue, and Cruz's testimony that Soderberg was aware of the possible error would make Jones' misrepresentation immaterial to the true purpose of the nonprosecution agreement. On the other hand, if Soderberg was never aware of Carter's true status prior to Jones' execution of the nonprosecution agreement, then the identification of who ordered the killings is a critical and important aspect of the nonprosecution agreement.

The trial court never decided the credibility conflict between Cruz and Soderberg. We therefore lack the necessary factual findings to decide whether there is clear and substantial evidence that the breach was

material and remand the case to resolve this issue. *See Walber v. Walber,* 40 Wis. 2d 313, 319, 161 N.W.2d 898, 901 (1968) (following a failure to make a necessary finding of fact an appellate court may remand the case for further proceedings). Upon remand, the trial court is not confined to the record as already developed. In its discretion, it may take additional testimony, order briefs and hear argument prior to making the necessary findings.

*By the Court.*—Order reversed and cause remanded with directions.