**2023 WI App 15**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

| | |
|---|---|
| Case Nos.: | 2022AP92-CR |
| | 2022AP93-CR |

†Petition for Review pending

Complete Title of Case:

**STATE OF WISCONSIN,†**

    **PLAINTIFF-APPELLANT,**

  **V.**

**DEBRA L. RIPPENTROP,**

    **DEFENDANT-RESPONDENT.**

---

**STATE OF WISCONSIN,**

    **PLAINTIFF-APPELLANT,**

  **V.**

**STEVEN E. RIPPENTROP,**

    **DEFENDANT-RESPONDENT.**

| | |
|---|---|
| Opinion Filed: | February 23, 2023 |
| Submitted on Briefs: | November 21, 2022 |

| | |
|---|---|
| JUDGES: | Blanchard, P.J., Graham, and Nashold, JJ. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jennifer L. Vandermeuse*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

Respondent
ATTORNEYS:          On behalf of the defendants-respondents, the cause was submitted on
                    the brief of *Jeremiah W. Meyer-O'Day*, of *Martinez & Ruby, LLP*,
                    Baraboo.

**2023 WI App 15**

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## February 23, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2022AP92-CR**
**2022AP93-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2019CF58
2019CF59

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

  PLAINTIFF-APPELLANT,

 V.

DEBRA L. RIPPENTROP,

  DEFENDANT-RESPONDENT.

---

STATE OF WISCONSIN,

  PLAINTIFF-APPELLANT,

 V.

STEVEN E. RIPPENTROP,

  DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Juneau County: STACY A. SMITH, Judge. *Affirmed*.

Before Blanchard, P.J., Graham, and Nashold, JJ.

¶1 GRAHAM, J. The State appeals a circuit court order dismissing criminal charges against Debra Rippentrop and Steven Rippentrop (collectively, the Rippentrops) with prejudice. In reaching its decision to dismiss the charges, the circuit court determined that the then-district attorney entered into a nonprosecution agreement with the Rippentrops but that the agreement violates public policy, and the court declined to enforce it on that basis. The court nevertheless dismissed the criminal charges with prejudice as a remedy for what it determined to be prosecutorial misconduct. On appeal, the State argues that the court lacked authority to dismiss the charges based on prosecutorial misconduct, and the Rippentrops argue that the dismissal can be affirmed on multiple grounds, including the existence of the nonprosecution agreement, which they contend is not contrary to public policy and should be enforced against the State.

¶2 We conclude that the then-district attorney had authority to enter into a nonprosecution agreement that binds the State, that the State has not met its burden to show that the agreement violates public policy, and that the agreement must therefore be enforced. We therefore affirm the dismissal of the criminal charges with prejudice on that basis, without addressing whether dismissal would also be appropriate based on prosecutorial misconduct.

**BACKGROUND**

¶3 In February 2019, the State charged both Debra and Steven Rippentrop with second degree recklessly endangering safety, false imprisonment,

physical abuse of a child, and mental harm to a child, each as party to a crime. The charges stemmed from abuse that the Rippentrops were alleged to have committed against their son, A.B.,[1] in or around 2014 and 2015.

¶4    The Rippentrops filed a motion to dismiss the charges against them. As grounds, they alleged that they had entered into an unwritten nonprosecution agreement with Michael Solovey when he was the district attorney of Juneau County; that they had performed all of their obligations under the agreement; and that they detrimentally relied on the promises Solovey made on behalf of the State. Their motion argued that the State had breached the nonprosecution agreement by filing criminal charges against them, and it sought specific performance of the agreement.[2] Along with their motion, the Rippentrops filed an affidavit by Solovey, which confirmed the existence of the nonprosecution agreement and the Rippentrops' performance of the conditions of that agreement.

¶5    The circuit court held a two-day evidentiary hearing to determine whether the nonprosecution agreement existed and, if so, whether it should be enforced. Solovey, Debra Rippentrop, Steven Rippentrop, their former attorney, two attorneys from Juneau County's office of corporation counsel, and other county officials testified at the evidentiary hearing, and the exhibits included transcripts from a John Doe proceeding and a hearing in which the Rippentrops consented to

---

[1] To protect his privacy, we refer to the victim using initials that do not correspond with his own. *See* WIS. STAT. RULE § 809.86(4) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version.

[2] Specific performance is an equitable remedy in which a court may order a party to perform its obligations under a contract. *See **Anderson v. Onsager**,* 155 Wis. 2d 504, 512-513, 455 N.W.2d 885 (1990). Here, the parties agree that specific performance of the nonprosecution agreement would result in dismissal of the criminal charges with prejudice.

terminations of their respective parental rights (TPR) to A.B.[3]  As discussed in greater detail below, the court ultimately determined that Solovey and the Rippentrops entered into a nonprosecution agreement, but the court declined to enforce the agreement on public policy grounds.

¶6      The following summary of facts is derived from the testimony and exhibits presented during the evidentiary hearing on the motion to dismiss.

*Criminal Investigation and CHIPS Case*

¶7      The Rippentrops' alleged abuse of A.B. first came to the attention of law enforcement in January 2015, after the Rippentrops reported him to be missing. When law enforcement located A.B., he said that he had run away because the Rippentrops had been physically restraining him "24 hours a day seven days a week."  That same day, law enforcement interviewed the Rippentrops.  They both acknowledged that they had been restraining A.B., but took the position that they had done so as a desperate measure to prevent him from harming himself or others due to violent and destructive behavior.

¶8      A.B. was returned to the Rippentrops' home that evening.  He ran away from home again in the summer of 2015, again reporting abuse, and the county human services department removed A.B. from the Rippentrops' home.  The department ultimately placed A.B. in the custody of other relatives, who later became his proposed guardians and eventually his adoptive parents.

---

[3] To differentiate among the three separate court proceedings at issue in this appeal, we refer to the court that presided over the John Doe proceeding as the "John Doe judge," the court that presided over the hearing on the petition to terminate the Rippentrops' parental rights as the "TPR court," and the court that presided over the motions to dismiss the criminal proceedings that are the subject of this appeal as the "circuit court."

¶9 Meanwhile, following A.B.'s initial report in January 2015, law enforcement referred the matter to the district attorney, Solovey, to consider criminal charges. At the same time, county corporation counsel initiated a child in need of protection or services (CHIPS) case that proceeded on a parallel track with Solovey's criminal investigation. *See* WIS. STAT. §§ 48.13, 48.335, 48.345. The Rippentrops retained Attorney Kerry Sullivan-Flock to represent them in the CHIPS case, and to assist them in connection with any criminal charges that might be filed.

¶10 As a part of his criminal investigation, Solovey asked county officials to obtain a comprehensive physical and psychological evaluation of A.B. Solovey later testified that he had concerns about A.B.'s credibility and whether his testimony, which was the primary evidence against the Rippentrops, would be credited by a jury at a criminal trial. Solovey testified that he discussed his concerns with law enforcement, officials at the county department of human services, and A.B.'s guardian ad litem. For their part, county officials expressed disagreement with Solovey's assessment of a potential criminal case against the Rippentrops and took the position that Solovey should pursue criminal charges.

¶11 During this time, Solovey was aware of the ongoing CHIPS case. Based on his communications with the Rippentrops' attorney, Sullivan-Flock, Solovey understood that the Rippentrops were challenging the allegations in the CHIPS case, and he believed that the case might result in A.B.'s return to the Rippentrops' home. Based on his communications with county officials, A.B., and his guardian ad litem, Solovey believed that a return to the Rippentrops' home would not be in A.B.'s best interests.

*The Nonprosecution Agreement*

¶12     On October 8, 2015, Solovey met with Sullivan-Flock and the Rippentrops and made the following settlement proposal. The State would not bring any criminal charges related to the Rippentrops' alleged abuse of A.B. if the Rippentrops would cooperate with the county in the CHIPS case and in any other regard, cease all contact with A.B., and voluntarily consent to terminations of their respective parental rights. Solovey's settlement proposal was communicated orally and was never reduced to writing.

¶13     Also on October 8, 2015, shortly after the settlement meeting, Solovey emailed law enforcement, stating: "I made a proposal to the Rippentrops and their attorney that, I am confident, is in the best interest of [A.B.], the Criminal Justice system, and the people of Juneau County. Please be advised that no criminal charges shall be filed in this matter at the present time, pending further negotiations in regard to the welfare and future of [A.B.]"

¶14     Also that same day, Solovey sent a similar email to two attorneys at the office of Juneau County corporation counsel, David Lasker and Margaret Waterman, who were handling the CHIPS case. Solovey wrote: "Please be advised that … I made a proposal to the Rippentrops and their attorney that, I am confident, will facilitate and render more sure and effective your negotiations with them in regard to the future of their son, [A.B.]; and is in the best interests of [A.B.], the Criminal Justice system and the people of Juneau County." Solovey asked Lasker and Waterman to contact him "if either or both of you would like to meet to discuss this very important matter further." Lasker responded by email, stating: "I am not sure what you are talking about when you say that you 'made a proposal to the Rippentrops and their attorney.'" Lasker continued: "My question to you is

whether you are going to file criminal charges against them or not. Please tell me if you have made your decision on that, one way or the other." Solovey responded: "Sorry for the confusion. No criminal charges at the present time."

¶15 Sullivan-Flock also reached out to Waterman at the office of corporation counsel to discuss the settlement. On November 3, 2015, she wrote, in relevant part:

> The Rippentrops and myself had a meeting with the DA in Juneau County regarding his review of possible criminal charges. He did offer a global resolution that was not unacceptable to the Rippentrops but certainly would require the county's participation at some level. Without disclosing all the details, the concepts of guardianship and termination of parental rights were both discussed. The goal of the DA seemed to be that [A.B.] would not return to live with the Rippentrops which would be their goal as well. There are some concerns for both types of resolutions, including a concern for [A.B.'s] insurance coverage since the Rippentrop[]s would not want [A.B.'s proposed guardians] to have to bear that cost. A termination of parental rights was brought up by the DA. While the Rippentrops are willing to discuss this option, they again have concerns about the insurance. Also, I have some concerns as to whether a court would grant a TPR in this instance and whether the [proposed guardians] would be approved as adoptive parents. It would seem that a guardianship could accomplish the same goal.

Waterman responded:

> Neither the Department of Human Services nor I knew anything about what the DA was offering. He has not discussed anything with us, which is surprising [because], as you noted, his offer requires the County's participation. Also, I don't think the DA can incorporate termination of parental rights into an agreement. That is extortion. From our standpoint, we are going to proceed down our own track, separate from the criminal aspect, towards a guardianship with the [proposed guardians]. Assuming [they are approved] for placement, I would be willing to dismiss the CHIPS action against the Rippentrops.

¶16    Meanwhile, the Rippentrops had assessed Solovey's proposed settlement and decided to accept it.  Sullivan-Flock contacted Solovey and verbally informed him of the Rippentrops' acceptance.[4]

¶17    The Rippentrops then began fulfilling the conditions of the nonprosecution agreement.  Previously, they had been contesting the allegations in the CHIPS case and were seeking a change in A.B.'s placement and his return to their home.  Following the agreement, the Rippentrops withdrew their request for a hearing and began cooperating with the county.  They also began pursuing voluntary terminations of their respective parental rights.   To that end, they ceased communicating with A.B.'s proposed guardians and worked with county officials to have them approved as adoptive parents.

¶18    On November 9, 2015, Solovey wrote to law enforcement that he had "decided to decline prosecution."  He wrote that "[t]here is insufficient admissible evidence … upon which a jury could find, beyond a reasonable doubt, that [the Rippentrops,] or either of them, had a criminal intent or were reckless in regard to their treatment of [A.B.]"  He also wrote that, in the event additional evidence was brought to his attention, he would "remain ready, willing and able to review [his] decision in this regard."

¶19    Solovey also met with Lasker and A.B.'s guardian ad litem to discuss the status of his criminal investigation.  During this meeting, Solovey explained that, in his view, A.B. was not a competent witness, and that Solovey had offered a settlement proposal to the Rippentrops.  The evidence suggests that, although

---

[4] Although the nonprosecution agreement was alluded to in the email correspondence with law enforcement and corporation counsel, discussed above, it was never memorialized in writing. On appeal, the State does not argue that this fact precludes its enforcement.

Solovey may not have informed Lasker and the guardian ad litem of all of the details of the nonprosecution agreement, he specifically informed them that he had agreed not to prosecute the Rippentrops in exchange for the Rippentrops consenting to terminations of their respective parental rights to A.B.

¶20     Solovey later testified that this information was "[not] received well," and that the office of corporation counsel was not happy about his decision to not charge the Rippentrops with criminal offenses. However, Solovey testified that he had his reasons for declining prosecution, and that the decision was his to make as the district attorney: "[The county officials] had been informed several times [of my reasons for declining prosecution].… [A]nd my opinion was the opinion of the State."

*The John Doe Proceeding*

¶21     In early 2016, the office of corporation counsel initiated a John Doe proceeding in regard to the Rippentrops' alleged abuse of A.B. *See* WIS. STAT. §§ 968.02(3), 968.26.[5]     Per common John Doe procedure, the proceeding was confidential, and the Rippentrops did not learn of its existence until later, after the present charges were filed against them in 2019.

¶22     The John Doe proceeding was held over two days in April 2016. Lasker and Waterman appeared at the proceeding in support of the county's petition. Lasker presented testimony from law enforcement officers and A.B.'s social

---

[5] Generally speaking, a "complaint charging a person with [a criminal] offense shall be issued only by a district attorney of the county where the crime is alleged to have been committed." *See* WIS. STAT. § 968.02(1). However, in situations in which the district attorney refuses to issue a complaint, a circuit court judge may itself issue a complaint under §§ 968.02(3) and 968.26 if, after conducting a hearing, the judge finds there is probable cause to believe that the person to be charged has committed an offense. Such hearings are called "John Doe proceedings" and may be initiated by any individual.

worker, and he introduced Solovey's October 8, 2015 email to law enforcement, in which Solovey stated that he had made a proposal to the Rippentrops and would not criminally charge them "pending further negotiations in regard to the welfare and future of [A.B.]" Solovey attended the John Doe proceeding, but he was not allowed to cross-examine witnesses or to testify.

¶23 At the conclusion of the hearing, the John Doe judge appointed a special prosecutor to make an independent determination on whether to file criminal charges against either or both of the Rippentrops. The judge concluded that Solovey had refused to issue criminal complaints, and that there was probable cause to believe that both of the Rippentrops had committed crimes with respect to their treatment of A.B. in or around 2014 and 2015.

¶24 After issuing his ruling, the John Doe judge allowed Solovey to make an on-the-record statement. In his statement, Solovey indicated that he had not pursued criminal charges because he was concerned about whether he could prove a case against the Rippentrops beyond a reasonable doubt. Solovey did not disclose the existence of the nonprosecution agreement to the John Doe judge. At that time, the Rippentrops had fulfilled some of the conditions of the nonprosecution agreement but had not yet petitioned the court for voluntary terminations of their respective parental rights. Solovey later testified that, at the time of the John Doe proceeding, he believed the Rippentrops would likely go through with the terminations, but he was not certain that they would do so. For its part, the office of corporation counsel had initiated the John Doe proceeding but did not inform the John Doe judge of its prior discussions with Solovey and Sullivan-Flock about the decision to decline prosecution in exchange for the Rippentrops' consent to terminations of their parental rights.

*The TPR Proceeding*

¶25    In May 2016, the Rippentrops signed petitions requesting termination of their respective parental rights to A.B., which the office of corporation counsel drafted and filed on their behalf.  In June 2016, the TPR court held a hearing on the petitions, and Waterman appeared on behalf of the county.  The Rippentrops were present at the hearing and each testified in support of termination.

¶26    During the TPR hearing, Debra and Steven were both questioned by their attorney, Sullivan-Flock.  Among other things, Sullivan-Flock asked them about the voluntariness of their decisions to terminate their parental rights.  Debra and Steven both answered "no" when Sullivan-Flock asked them whether anyone had promised them anything, or threatened or coerced them.  Sullivan-Flock followed up on Debra's response as follows:  "Other than reaching this decision, I guess we'll say globally between the County and the guardian ad litem and the corporation counsel and your husband, other than those agreements that everyone believes that we're on the same page for [A.B.], you have not been told anything or said this is the way you're going to have to do this?"  Debra responded "no."  She testified that she was "making this decision of [her] own free will."  Similarly, Sullivan-Flock asked Steven:  "Other than the conversations that we have all had, by 'we' I mean ourselves and Juneau County and other officials, other than the plan we all agreed was in [A.B.'s] best interest, has anybody promised you anything outside of that agreement as to a plan to get you to reach this decision?"  Steven responded "no."  He testified that he was making this decision "freely and voluntarily."

¶27    The TPR court issued orders terminating the Rippentrops' parental rights to A.B. and dismissing the CHIPS case.  Shortly thereafter, Solovey

11

determined that the Rippentrops had satisfied all conditions of the nonprosecution agreement.

*The Criminal Complaint*

¶28     Meanwhile, the special prosecutor appointed by the John Doe judge had not made any charging decision in the Rippentrop matter.  In November 2016, Juneau County elected a new district attorney, who replaced Solovey.  Upon his election, the new district attorney took the Rippentrop matter back from the special prosecutor.

¶29     More than two years later in February 2019, the State filed criminal charges against the Rippentrops.  As noted, the Rippentrops, who were represented by new counsel, moved for specific performance of the nonprosecution agreement, and the circuit court held the hearing summarized above.  Following the hearing, the court ordered additional briefing regarding the enforceability of the nonprosecution agreement.  The State advanced several reasons that the criminal charges should not be dismissed.  Among other things, the State argued that, to the extent that the alleged nonprosecution agreement was a contract, it was void as against public policy because it required the Rippentrops to terminate their parental rights.  This argument about public policy is the argument that is most prominently preserved by the State on appeal.[6]

---

[6] The State also argued that the oral agreement was unenforceable under WIS. STAT. § 807.05, which requires certain stipulations to be made in writing and subscribed by the party to be bound thereby; and, that the nonprosecution agreement was merely executory until the point in time in which the Rippentrops terminated their parental rights, by which time the John Doe judge had divested Solovey of his prosecutorial authority over the Rippentrop matter.  The circuit court did not rest its determination on either of these grounds, and the State does not renew these arguments on appeal.  We therefore address them no further.

¶30 In an oral ruling, the circuit court determined that the Rippentrops met their burden of proving that Solovey had entered into an unwritten nonprosecution agreement with them on behalf of the State. The court also determined that Solovey made an offer to provide something of value to the Rippentrops, that the Rippentrops accepted Solovey's offer, and that the Rippentrops detrimentally relied upon the agreement by performing its conditions. The court acknowledged the strong public policy "that contracts, especially contracts with the State, should be enforced."

¶31 However, the circuit court ultimately concluded that the nonprosecution agreement was unenforceable. In reaching this conclusion, the court criticized Solovey's and Sullivan-Flock's conduct in very strong terms, but the substance of its legal reasoning for not enforcing the agreement was as follows. First, the court concluded that it was against public policy "to make any arrangement that would terminate a [parent's] rights by either a threat or some kind of contract such as this." The court likened the agreement to the sale of a child, concluding that, much like it violates public policy to offer an expectant mother money for her unborn child, the nonprosecution agreement violates public policy because it offered the Rippentrops something of value in exchange for terminating their parental rights. Second, the court commented that the Rippentrops did not have "clean hands" and that, by failing to disclose the promises that Solovey made in the nonprosecution agreement, the Rippentrops misrepresented a material fact to the TPR court and "didn't fulfill their part of the [agreement]."

¶32 The criminal cases against the Rippentrops proceeded and, one year later, the Rippentrops filed a second motion to dismiss. This time, the Rippentrops argued that Solovey had committed prosecutorial misconduct by proposing the nonprosecution agreement upon which the Rippentrops had relied, and that the

charges should be dismissed on that basis. The circuit court granted the motion, concluding that Solovey's actions "clearly" constituted "misconduct" and that the only recourse for maintaining the integrity of the judicial system is dismissal of the criminal charges with prejudice. The State appeals.

## DISCUSSION

¶33 The State's opening appellate brief focuses exclusively on prosecutorial misconduct, which was the circuit court's stated basis for dismissing the criminal charges against the Rippentrops. Specifically, the State argues that the court lacked the authority to dismiss the charges with prejudice as a sanction for prosecutorial misconduct. In their response brief, the Rippentrops address the State's arguments about prosecutorial misconduct, and they also raise the existence of, and their reliance on, the nonprosecution agreement as an alternative basis for affirming the dismissal of the charges. The State responds to the Rippentrops' arguments about the nonprosecution agreement in its reply brief.

¶34 We may affirm the circuit court's dismissal of charges "on an alternative ground as long as the record is adequate and the parties have had the opportunity to brief the issue on appeal." *See Glendenning's Limestone & Ready-Mix Co., Inc. v. Reimer*, 2006 WI App 161, ¶14, 295 Wis. 2d 556, 721 N.W.2d 704 (internal citation omitted). Here, the record is thoroughly developed regarding the existence and enforceability of the nonprosecution agreement, and the parties have had the opportunity to adequately brief the issue in the circuit court and on appeal. Because we affirm the court's dismissal of the charges on the basis of the nonprosecution agreement, which we determine is binding and enforceable, we do not address the parties' argument about whether the court correctly dismissed the charges based on prosecutorial misconduct. *See Barrows v. American Fam. Ins.*

14

*Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

¶35    We begin our analysis by briefly setting forth the law governing nonprosecution agreements. We then address an argument that the State may be raising on appeal—that the nonprosecution agreement does not bind the State because, unlike a plea agreement, its formation was not subject to judicial oversight. Finally, we turn to the State's argument that the nonprosecution agreement should not be enforced because it is contrary to public policy.

## I.  Overview of the Law on Nonprosecution Agreements

¶36    Prosecutors have authority to enter into agreements related to criminal matters that bind the State. *See **State v. Scott***, 230 Wis. 2d 643, 662, 602 N.W.2d 296 (Ct. App. 1999) ("Prosecutors are agents of the State, and it is the State rather than the individual prosecutor [that] is bound by the agreement.").

¶37    The most common type of agreements between prosecutors and defendants are plea agreements.[7] ***State v. Conger***, 2010 WI 56, ¶15, 325 Wis. 2d 664, 797 N.W.2d 341. Plea agreements are a common feature of criminal proceedings, and there is a vast body of case law addressing them. Because plea agreements are formed after criminal charges have already been filed and the jurisdiction of the circuit court invoked, such agreements are subject to judicial oversight, and the court may reject a plea agreement that is not in the public interest. ***State v. Kenyon***, 83 Wis. 2d 36, 45, 270 N.W.2d 160 (1978).

---

[7] Deferred prosecution agreements are another type of agreement between a prosecutor and a criminal defendant. *See generally* WIS. STAT. ch. 971.

15

¶38    Wisconsin courts have also recognized that prosecutors have authority to enter into agreements with persons who may have committed crimes but have not yet been charged by the State.  *See, e.g.*, **State v. Jones**, 217 Wis. 2d 57, 576 N.W.2d 580 (Ct. App. 1998).  Such agreements are often referred to as "nonprosecution agreements."

¶39    A nonprosecution agreement is an agreement between a prosecutor and a criminal suspect in which the prosecutor agrees to not file criminal charges, often in exchange for some performance on the part of the suspect.  *See, e.g.*, **id.** Like a plea agreement, a nonprosecution agreement is a vehicle by which to resolve a criminal matter as an alternative to a trial.  However, nonprosecution agreements also differ from plea agreements in some material respects.  Unlike plea agreements, nonprosecution agreements are precharging decisions that stem from a prosecutor's inherent discretionary authority to charge or not to charge crimes in the interests of justice.  **Id.** (discussing a district attorney's authority to enter into such agreements); **State ex rel. Kalal v. Circuit Ct. for Dane Cnty.**, 2004 WI 58, ¶30, 271 Wis. 2d 633, 681 N.W.2d 110 (recognizing a prosecutor's vast authority to charge or not to charge, and observing that there is no obligation on the part of a district attorney to prosecute all reports of alleged crimes that may reach the district attorney's office).  And, unlike plea agreements, the formation and performance of nonprosecution agreements are not necessarily subject to judicial oversight.  Indeed, provided that neither the State nor the suspect breaches a nonprosecution agreement, its existence and terms are not likely to come to the attention of any court.

¶40    For that reason, the case law about nonprosecution agreements is slim. **Jones**, 217 Wis. 2d 57; *see also* **State v. Lukensmeyer**, 140 Wis. 2d 92, 409 N.W.2d 395 (Ct. App. 1987); **State v. Whitman**, 160 Wis. 2d 260, 466 N.W.2d 193 (Ct. App. 1991).  Nevertheless, as mentioned above and discussed in greater detail below,

Wisconsin cases have recognized that such agreements are legal, and that prosecutors have authority to enter into them when, in the prosecutor's discretion, doing so will further the interests of justice. *Jones*, 217 Wis. 2d at 64-65; *Lukensmeyer*, 140 Wis. 2d at 102; *Whitman*, 160 Wis. 2d at 268.

¶41    In this appeal, the State does not contest the circuit court's determination that Solovey entered into a nonprosecution agreement with the Rippentrops or its determination that the nonprosecution agreement is a contract. However, the State argues that the court properly declined to enforce the agreement for what we discern to be two reasons, each of which we address below.

## II.  Lack of Judicial Oversight

¶42    Although the argument is not well developed, the State may be arguing that the nonprosecution agreement does not bind the State because, unlike a plea agreement, the formation of the nonprosecution agreement was not subject to judicial oversight.[8]  To the extent that the State is making this argument, it fails for two reasons.

¶43    First, this court has expressly rejected the argument that a court must approve of a nonprosecution agreement before it can bind the State. *Jones*, 217 Wis. 2d at 61.  In *Jones*, the nonprosecution agreement at issue provided that the State would not charge Jones for a double homicide if Jones told law enforcement what he knew about that crime. *Id.* at 59-60.  The State later filed a criminal complaint charging Jones with the double homicide, and Jones moved to dismiss the charges based on the nonprosecution agreement. *Id.* at 60-61. The circuit court

---

[8] In fairness, we acknowledge that the State may not be advancing this argument, and may simply be attempting to distinguish cases cited by the Rippentrops that address plea agreements. For the sake of completeness, we nevertheless address this as a potential argument by the State.

declined to enforce the agreement on the ground that it "was not a legal agreement" because district attorneys do not have "the authority to enter into any kind of agreement that grants anybody immunity." *Id.* at 62 (internal citation omitted). The court likened nonprosecution agreements to formal grants of immunity, which only a court of law could confer. *Id.* at 62, 63; *see also* WIS. STAT. § 972.08.

¶44 On appeal, we disagreed with the circuit court's conclusion that a district attorney lacks authority to enter into a binding nonprosecution agreement on behalf of the State. *Id.* at 63-64. We explained that the court "failed to distinguish between [situations] in which [a suspect] has become subject to the control of the court, and those situations [in which] the court is not yet involved and the suspect is yet uncharged." *Id.* at 63. We concluded that a district attorney has the authority to enter into precharging nonprosecution agreements without court approval. *Id.* at 63-64. We explained that "[t]he discretion resting with the district attorney in determining whether to commence a [criminal] prosecution is almost limitless," and that "justice, not convictions," is the district attorney's goal. *Id.* at 64-65 (internal citation omitted). We further explained that, "if it is within the discretionary power of the district attorney not to bring a criminal charge, it is also within [the district attorney's] power to enter into a precharge, nonprosecution agreement in exchange for information if it is determined that doing so will further the administration of justice." *Id.* at 64.[9]

¶45 Second, Wisconsin cases suggest that *any* prosecutorial promise—whether embodied in a nonprosecution agreement or an unexecuted plea

---

[9] Although the ***Jones*** court addressed the district attorney's authority to enter into a nonprosecution agreement in exchange for information regarding criminal activity, the State does not argue that ***Jones*** limits a district attorney's authority to offer that specific bargain. ***Jones*** appears to acknowledge a district attorney's inherent authority to enter into such agreements when, in the district attorney's discretion, doing so will further the interests of justice.

18

agreement—may become binding if a party detrimentally relies upon it. In ***Jones***, for example, we implicitly determined that the nonprosecution agreement at issue in that case was enforceable against the State after the suspect provided information to law enforcement pursuant to the agreement. *Id.* at 63-65; *see also* ***State v. Bond***, 139 Wis. 2d 179, 188, 407 N.W.2d 277 (Ct. App. 1987) ("Once a defendant has [detrimentally] relied upon a prosecutorial promise in any way and the state does not fulfill its promise, the promise is to be held enforceable against the state."); ***State v. Beckes***, 100 Wis. 2d 1, 6, 300 N.W.2d 871 (Ct. App. 1980) ("The concept of fundamental fairness does prohibit the government from breaking a promise which induced the defendant to take some action detrimental to [the defendant] in reliance on the bargain."); ***Scott***, 230 Wis. 2d at 653 & n.6 (explaining that an unexecuted plea agreement is enforceable if the defendant demonstrates detrimental reliance, and in contrast, a defendant need not show detrimental reliance after the defendant has entered a plea).

¶46     The State appears to acknowledge that the Rippentrops detrimentally relied on the nonprosecution agreement. Specifically, the State does not challenge the circuit court's findings that Solovey made an offer on behalf of the State to not charge the Rippentrops for their alleged abuse of A.B. in exchange for their performance of certain conditions, that the Rippentrops accepted Solovey's offer, and that they then took actions to their detriment in reliance on the agreement. In any case, the record supports these findings; among other things, there is evidence that the Rippentrops cooperated with the county in the CHIPS case, waived their rights to various hearings, ceased all contact with A.B. and his proposed guardians, and initiated the proceeding in which they consented to terminating their parental rights. Indeed, the State acknowledges that the Rippentrops went through with the

TPR proceeding in reliance on the nonprosecution agreement, and that they cannot now be returned to the position they were in before the agreement was made.

¶47   Therefore, we reject any argument that the State may be making that, without judicial oversight, the nonprosecution agreement does not bind the State. We conclude that it is a binding agreement that should be enforced, unless the agreement is unenforceable on some other ground.

### III.  Public Policy

¶48   Generally speaking, once the existence of a contract has been established, as it has in this case, the party seeking to void the contract has the burden of proving the applicability of a contract defense.[10]  *See, e.g.*, *Wisconsin Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶30, 290 Wis. 2d 514, 714 N.W.2d 155 (the party seeking to have a contract set aside as unconscionable carries the burden of proving unconscionability).  Here, the State argues that the circuit court correctly determined that the nonprosecution agreement is contrary to public policy, and we conclude that the State has the burden to prove that this contract defense applies.  Whether a contract is contrary to public policy is a question of law that we

---

[10] Principles of contract law, including traditional contract defenses, generally apply to plea agreements.  *See State v. Scott*, 230 Wis. 2d 643, 654-55, 602 N.W.2d 296 (Ct. App. 1999) (discussing the general applicability of contract law analogies to plea agreements); *State v. Rivest*, 106 Wis. 2d 406, 413, 316 N.W.2d 395 (1982) (observing that courts look to contract law analogies in determining the rights of defendants aggrieved in the plea negotiation process, but noting that such analogies are not solely determinative because fundamental due process rights may also be implicated); *State v. McQuay*, 154 Wis. 2d 116, 125-26, 452 N.W.2d 377 (1990) (discussing applicability of the void-as-against-public-policy doctrine to plea agreements); *State v. Ferguson*, 166 Wis. 2d 317, 324, 479 N.W.2d 241 (Ct. App. 1991) (same).

The parties appear to agree, and we see no reason not to conclude, that traditional contract law defenses are likewise generally available to the State to defend against the Rippentrops' motion for specific performance of the nonprosecution agreement.  *See State v. Lukensmeyer*, 140 Wis. 2d 92, 102, 409 N.W.2d 395 (Ct. App. 1987) (analyzing a nonprosecution agreement nearly identically to a plea agreement, and analogizing both to contracts).

review independently of the determination made by the circuit court. ***Northern States Power Co. v. National Gas Co., Inc.***, 2000 WI App 30, ¶7, 232 Wis. 2d 541, 606 N.W.2d 613.

¶49     A contract is void and will not be enforced by a court if it is contrary to public policy. ***Rosecky v. Schissel***, 2013 WI 66, ¶¶57, 68, 349 Wis. 2d 84, 833 N.W.2d 634 (commonly referred to as "***In re F.T.R.***"). A contract is not void as against public policy simply because a given decision maker does not approve of the bargain that was struck, or considers the subject matter or result of the contract to be distasteful.  Instead, a contract is void as against public policy if its enforcement would violate a public policy "expressed by statute, by administrative regulation, or by a court's expression of the policy of the common law." ***Northern States Power Co.***, 232 Wis. 2d 541, ¶8.  A contract will be determined to be void as against public policy only "in cases free from doubt," ***id.***, and only if "the interests in enforcing the contract are clearly outweighed by the interests in upholding the policy that the contract violates," ***Rosecky***, 349 Wis. 2d 84, ¶68.

¶50     The State argues that the nonprosecution agreement at issue in this case violates public policy for what we discern to be two reasons.  First, it argues that it is contrary to WIS. STAT. § 48.41, which sets forth the procedure for voluntarily terminating parental rights.  Second, the State may be suggesting that the agreement was akin to an agreement to withhold relevant information from the TPR court, and that it is void on that basis.  We address these arguments in turn, explaining why we conclude that the State has not met its burden to show that the nonprosecution agreement is contrary to public policy and why the agreement must be enforced.

21

## A. WISCONSIN STAT. § 48.41

¶51 Parental rights are fundamental rights, and termination of parental rights proceedings are governed by the procedures prescribed by WIS. STAT. ch. 48 and the dictates of due process. *T.M.F. v. Children's Serv. Soc'y of Wisconsin*, 112 Wis. 2d 180, 184-85, 332 N.W.2d 293 (1983) (commonly referred to as "*In re D.L.S.*"). A parent may *voluntarily* consent to a termination of parental rights under WIS. STAT. § 48.41, provided that the parent's consent is informed and voluntary, and termination is in the best interests of the child. *See* WIS. STAT. §§ 48.41(2), 48.426; *A.B. v. P.B.*, 151 Wis. 2d 312, 319-22, 444 N.W.2d 415 (Ct. App. 1989). Alternatively, a county may petition for an *involuntary* termination of a parent's rights under WIS. STAT. § 48.415 if certain grounds, including continuing need of protection or services, continuing denial of physical placement, or child abuse, are established. *See* § 48.415(2), (4), (5). In such cases, the county must prove that there are grounds for terminating the parent's rights and that termination is in the best interests of the child. *See Steven V. v. Kelley H.*, 2004 WI 47, ¶¶24-27, 271 Wis. 2d 1, 678 N.W.2d 856.

¶52 The State argues that the condition of the nonprosecution agreement that required the Rippentrops to consent to terminating their parental rights violates the public policy expressed in WIS. STAT. § 48.41 and in *T.M.F.*, 112 Wis. 2d 180. Specifically, the State argues that § 48.41 "expresses a policy that voluntary termination of parental rights must be, in fact, voluntary." And the State cites to *T.M.F.* for the proposition that, to ensure that a parent's consent to termination is voluntary and informed, a TPR court must engage in an on-the-record inquiry with the parent, asking (among other things) whether any promises or threats have been made. *T.M.F.*, 112 Wis. 2d at 185-87, 196. In essence, the State appears to be arguing that any agreement requiring a parent to consent to a voluntary termination

of parental rights is a contradiction in terms, and that a parent's decision to terminate their parental rights is necessarily involuntary if it is part of a larger negotiation that eliminates the parent's potential exposure to criminal charges for child abuse.

¶53    We agree with the State that a voluntary termination of parental rights must in fact be voluntary. However, the State has not persuaded us that any agreement requiring a parent to voluntarily terminate their parental rights is necessarily a contradiction in terms, or that a parent's decision to terminate their parental rights cannot be voluntary if the parent agreed to do so as part of a nonprosecution agreement. *See* ***Northern States Power Co.***, 232 Wis. 2d 541, ¶8 (providing that a contract is void as against public policy only "in cases free from doubt").

¶54    In reaching this conclusion, we consider the law governing plea agreements, mindful that those cases do not present a perfect analogy. Criminal defendants frequently enter into plea agreements that require them to waive valuable rights, and the defendant's performance under the plea agreement—that is, the entry of a plea in which the defendant waives constitutional trial rights—is not considered involuntary merely because the defendant was motivated or induced to enter into the plea agreement by a desire to obtain its benefits. ***Rahhal v. State***, 52 Wis. 2d 144, 151, 187 N.W.2d 800 (1971). As our supreme court has explained, "[a] voluntary and intelligent choice always involves two or more alternatives, each having some compelling power of acceptance," and "[t]he fact that a defendant must make a choice between two reasonable alternatives and take the consequences [of that choice] is not coercive of the choice finally made." ***Id.***

¶55    As we have previously explained, "[w]hether a guilty plea is voluntarily and intelligently made is a conclusion with respect to the state of mind

of the accused." ***Verser v. State***, 85 Wis. 2d 319, 329, 270 N.W.2d 241 (Ct. App. 1978). When taking a defendant's plea, a circuit court is required to make an "[i]nquiry with respect to threats and promises … for the purpose of determining the accused's state of mind with respect to the voluntariness and intelligence of the guilty plea." ***Id.*** However, unless any promises or threats "coerce or induce the plea to an extent that deprives the accused of understanding and free will," the threats or promises "provide no basis" for determining that the accused's plea was involuntary. ***Id.*** Our supreme court reached a similar conclusion in ***T.M.F.***, which addressed the voluntariness of a teenage mother's consent to a termination of her parental rights. ***T.M.F.***, 112 Wis. 2d at 194 ("Parental advice, argument, or persuasion do not constitute coercion if the individual who has to make the decision acts freely when [the individual] gives consent, even though the consent might not have been executed except for the advice, argument, or persuasion.").

¶56 Here, the Rippentrops maintain that their acceptance of the nonprosecution agreement, and the ultimate terminations of their parental rights, were informed and voluntary. At the time they accepted the then-district attorney's settlement proposal and terminated their parental rights, they faced the distinct possibility of criminal liability, as well as the distinct possibility that the county would pursue involuntary terminations of their parental rights on any number of grounds, including continuing need of protection or services, continuing denial of physical placement, or child abuse. *See* WIS. STAT. § 48.415(2), (4), (5). Under the circumstances, the State does not persuade us that the Rippentrops could not have freely decided that it was in their best interest to reach an agreement in which they acceded to the terminations of their parental rights in exchange for a promise of nonprosecution. Much like it does not violate public policy for a criminal defendant to enter into a plea agreement that induces the defendant to waive valuable rights in

exchange for receiving the agreement's benefits, the State does not persuade us that the provision in the nonprosecution agreement that required the Rippentrops to voluntarily terminate their parental rights violated any public policy clearly expressed by WIS. STAT. § 48.41 or *T.M.F.*

¶57 The State also cites to *Rosecky*, 349 Wis. 2d 84, ¶¶65-66, a recent case from our supreme court that addressed the enforceability of an agreement to voluntarily terminate a parent's rights. Yet the State does not develop an argument that *Rosecky* supports the proposition that any contract term requiring a parent to agree to voluntary termination of parental rights is contrary to the public policies expressed in WIS. STAT. § 48.41 and *T.M.F.*

¶58 In *Rosecky*, a surrogate mother-to-be signed a surrogacy agreement that contained a number of terms, including one that required her to voluntarily terminate her parental rights after her child was born. *Id.*, ¶10 & n.2. There was no claim that the surrogate mother did not understand the contract when she signed it—indeed, it had been her idea to act as a surrogate in the first instance. *Id.*, ¶67. However, after a falling out with the adoptive parents-to-be, and after giving birth to the child, the surrogate mother changed her mind. *Id.*, ¶12. She no longer consented to the voluntary termination of her parental rights and sought relief from the surrogacy agreement. *Id.*, ¶13.

¶59 Our supreme court upheld most of the terms in the surrogacy agreement, but explained that it would not enforce the particular term that required the surrogate mother to voluntarily terminate her parental rights. *Id.*, ¶¶64-65, 69. As the court explained, that term "did not comply with the procedural safeguards set forth in WIS. STAT. § 48.41 because [the surrogate mother] would not consent to the TPR and there [was] no basis for an involuntary termination." *Id.*, ¶65.

Accordingly, ***Rosecky*** stands for the proposition that a contract term, which is voluntarily agreed to when made, and that requires consent to a voluntary termination of parental rights, may become unenforceable at a later date if the parent reneges and refuses to consent to the termination. *See* ***Venisek v. Draski***, 35 Wis. 2d 38, 48-49, 150 N.W.2d 347 (1967) ("a court of equity does not aid a party to enforce an illegal transaction which is still executory") (internal citation omitted).

¶60   This posture clearly distinguishes the court's refusal to enforce the contract term in ***Rosecky*** from the enforcement of the nonprosecution agreement in this case.  Unlike in ***Rosecky***, no party in this case asked the circuit court to enforce a term that requires a "voluntary" termination of a parent's rights, despite the parent's lack of consent.  To the contrary, the Rippentrops have long since performed all of their obligations under the nonprosecution agreement, including the term requiring them to consent to terminating their parental rights, and the only provision left to enforce is the State's end of the bargain—its agreement to not prosecute the Rippentrops.  Accordingly, a court order requiring specific performance of the State's obligations under the nonprosecution agreement would not enforce the execution of any contract term that is illegal or contrary to public policy.

### B.  Withholding Information From a Court

¶61   As mentioned, the State may also be arguing that the nonprosecution agreement violates public policy because it is akin to an agreement to withhold information from the courts.  The State points out that Solovey did not disclose the existence of the nonprosecution agreement to the John Doe judge, and the Rippentrops did not disclose its existence to the TPR court.  In light of these

26

omissions, the State suggests that the nonprosecution agreement amounted to a secret backroom deal that should not be enforced by any court.

¶62 Our cases establish that agreements by a prosecutor to withhold relevant information about a criminal defendant from a sentencing court violate public policy and cannot be respected by the courts. *See State v. McQuay*, 154 Wis. 2d 116, 125-26, 452 N.W.2d 377 (1990) (citing *Grant v. State*, 73 Wis. 2d 441, 448, 243 N.W.2d 186 (1976); *State v. Ferguson*, 166 Wis. 2d 317, 324, 479 N.W.2d 241 (Ct. App. 1991)). For the sake of addressing the State's argument, we assume without deciding that similar policies apply to the John Doe and TPR proceeding in this case, and that, had the nonprosecution agreement required either party to withhold relevant information from those courts, it might be void on public policy grounds.

¶63 However, as the State acknowledges, the facts of this case do not involve an explicit agreement to withhold information about the nonprosecution agreement from any court. And the State points to no evidence in the record suggesting that nondisclosure was an implicit condition of the agreement.

¶64 If anything, the evidence in the record belies any suggestion that the parties to the nonprosecution agreement agreed to keep its existence secret. As discussed above, Solovey informed law enforcement and the office of corporation counsel about the existence of his settlement proposal on the same day that he communicated it to the Rippentrops and Sullivan-Flock. Then, Solovey specifically informed corporation counsel and the guardian ad litem who later represented A.B.'s interest at the TPR hearing that he had agreed not to prosecute the Rippentrops for child abuse if they agreed to a voluntary termination of their parental rights. Accordingly, there is evidence that the existence and most essential

27

terms of the nonprosecution agreement were known to the individuals in the office of corporation counsel who initiated the John Doe proceeding, and then drafted and filed the Rippentrops' petitions for voluntary termination of their parental rights and represented the county at the TPR hearing. Although the aforementioned individuals were not parties to the deal the Rippentrops struck with Solovey—indeed, it appears that they strenuously disapproved of its terms—they made no objection to receiving its benefits when the Rippentrops followed through with their promise to consent to the termination of their parental rights.

¶65    In regard to Solovey's statements during the John Doe proceeding, it is curious that he did not mention the existence of the nonprosecution agreement to the John Doe judge. Although the Rippentrops had not fully performed their obligations under the agreement at the time the John Doe proceeding took place, Solovey expected them to do so, and the relevance of the not-yet-fulfilled agreement to the issues in the John Doe proceeding should have been apparent. However, the State does not argue that Solovey's failure to disclose the agreement reflects on the Rippentrops, who had no role in the John Doe proceeding and, according to their undisputed testimony, were unaware that it was taking place.[11]

¶66    As for the Rippentrops' testimony during the TPR hearing, it certainly would have been better had they expressly disclosed the existence of the nonprosecution agreement to the TPR court. That way, the TPR court would have been able to conduct further inquiries to assess the "state of [their] mind[s] with respect to the voluntariness" of their consent, and to satisfy itself that the promise

---

[11] The State does not identify any case in which a court has voided a contract on public policy grounds because one of the parties to the contract allegedly commits misconduct at some point after the contract was formed. *See* RESTATEMENT (SECOND) OF CONTRACTS § 178(3)(d) (1981) (in weighing the interests against enforcement, account is taken of the directness of the connection between the misconduct and the term).

28

of nonprosecution had not "coerce[d] or induce[d]" the Rippentrops' consent "to an extent that deprive[d] [them] of understanding and free will." *See Verser*, 85 Wis. 2d at 329. However, Debra later testified that she did not specifically disclose the existence of the nonprosecution agreement because "we were under the understanding that everybody knew about this agreement." And indeed, Attorney Sullivan Flock's questioning referred to a "global resolution" and "agreement" with the county, and suggested that it was pursuant to a global agreement that the Rippentrops were voluntarily terminating their parental rights. Under the circumstances, the State does not persuade us that the Rippentrops were party to an unlawful agreement to withhold relevant information from the TPR court.[12]

---

[12] We now briefly explain why we do not consider the "clean hands" doctrine as a defense for the State. As noted above, the circuit court concluded that, by failing to disclose Solovey's promise to the TPR court, the Rippentrops omitted a material fact from the court's consideration, did not have clean hands, and could not seek specific performance of the nonprosecution agreement on that basis. Although the State mentions this ruling by the court in its briefing, it does not clearly advance any argument about the clean hands doctrine on appeal.

We have described the clean hands doctrine as follows. "[A] party who has been guilty of substantial misconduct [regarding] the matters in litigation such that the party has in some measure affected the equitable relations … between the … parties and arising out of the transaction shall not be afforded relief when [the party guilty of misconduct] comes into court." *State v. Kaczmarski*, 2009 WI App 117, ¶15, 320 Wis. 2d 811, 772 N.W.2d 702 (internal citation omitted). As we explained, "[b]efore a court may deny a plaintiff relief in equity upon the 'clean hands' doctrine, it must clearly appear that the things from which the [party guilty of misconduct] seeks relief are the fruit of [that party's] own wrongful or unlawful course of conduct." *Id.* (internal citation omitted).

Here, at best, the State argues that the Rippentrops "bear some responsibility for any prejudice that occurred" when they consented to the termination of their parental rights in reliance on Solovey's promise, without disclosing that promise to the TPR court. The State makes no attempt to connect this sentiment to the legal requirements of the clean hands doctrine. We therefore conclude that the State has abandoned any reliance on this doctrine on appeal, and we address it no further. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not address undeveloped arguments); *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) (we need not address abandoned arguments).

### C. Enforcement is Equitable

¶67     For the reasons we have explained, the State has not met its burden to show that the nonprosecution agreement violates any public policy. This conclusion is dispositive—as explained above, a contract will be determined to be void as against public policy only if "the interests in enforcing the contract are clearly outweighed by the interests in upholding the policy that the contract violates," *Rosecky*, 349 Wis. 2d 84, ¶68, and only "in cases free from doubt," *Northern States Power Co.*, 232 Wis. 2d 541, ¶8.

¶68     Although we need not weigh the policies in favor of enforcement, we note that the public policy in favor of enforcing the nonprosecution agreement is compelling. Generally speaking, public policy favors the enforcement of contracts. *See Rosecky*, 349 Wis. 2d 84, ¶56; *Merten v. Nathan*, 108 Wis. 2d 205, 211, 321 N.W.2d 173 (1982). And here, substantive due process and principles of fundamental fairness render the enforcement of this prosecutorial promise even more compelling. *State v. Castillo*, 205 Wis. 2d 599, 607, 556 N.W.2d 425 (Ct. App. 1996) ("[A]ny violation of a prosecutorial promise triggers consideration of fundamental fairness and a deprivation of due process." (internal citation omitted)).

¶69     For all these reasons, we conclude that Solovey had authority to enter into a nonprosecution agreement that binds the State, and that the State has not met its burden to show that the agreement violates public policy. The State makes no other argument against specific performance of the agreement. We therefore conclude that the agreement must be enforced and we affirm the dismissal of the criminal charges with prejudice on that basis, without addressing whether dismissal would also be appropriate based on prosecutorial misconduct.

*By the Court.*—Order affirmed.